**Johnny SANDERS, Plaintiff,**

v.

**CITY OF MONTGOMERY, Defendant.**

No. 2:02–CV–1316–F.

United States District Court, M.D. Alabama, Northern Division.

April 30, 2004.

Priscilla Black Duncan, P.B. Duncan & Associates, LLC, Montgomery, AL, for Plaintiff.

Charles A. Everage, Browne Flebotte Wilson & Horn Pllc, Charlotte, NC, Kimberly O. Fehl, City of Montgomery, Walter R. Byars, Steiner Crum & Baker, Montgomery, AL, for Defendant.

## MEMORANDUM OPINION AND ORDER

FULLER, District Judge.

## I. INTRODUCTION

Johnny Sanders (hereinafter "Sanders") has brought this lawsuit pursuant to feder-

al anti-discrimination statutes against his former employer the City of Montgomery contending that it discriminated against him on the basis of his race and retaliated against him for protected conduct. Sanders' suit also set forth a claim against the City of Montgomery pursuant to Alabama law for negligence in its management of the landfill and its staff. This cause is presently before the Court on the Defendant City of Montgomery's Motion for Summary Judgment (Doc. # 45) filed on September 17, 2003. For the reasons set forth in this Memorandum Opinion and Order, the City of Montgomery is entitled to summary judgment on Sanders' claims pursuant to federal law, and this Court declines to exercise supplemental jurisdiction over Sanders' claim pursuant to Alabama law.

## II. JURISDICTION AND VENUE

The Court exercises subject matter jurisdiction over the federal claims in this action pursuant to 28 U.S.C. § 1331 (federal question) and over the claim under Alabama law pursuant to 28 U.S.C. § 1367 (supplemental jurisdiction). The parties do not contest personal jurisdiction or venue, and the Court finds adequate allegations supporting both.

## III. PROCEDURAL HISTORY

On December 3, 2002, Sanders filed this lawsuit against the City of Montgomery and Charles E. Shaner (hereinafter "Chuck Shaner"), Sanders' former supervisor. The first two counts of the Complaint originally filed in this action (Doc. # 1) set forth claims of race discrimination against Sanders pursuant to 42 U.S.C. § 2000e, et seq ("Title VII") and 42 U.S.C. § 1981 ("Section 1981"). The third count in the Complaint was a claim for negligence

brought pursuant to Alabama law. Consistent with his Charge of Discrimination with the EEOC, Sanders complained about alleged discrimination with respect to promotions and training. He also claimed that despite being denied a promotion he was given the same job duties and responsibilities as those who were promoted and was forced to work weekends because they would not.

On December 20, 2002, the City of Montgomery filed its Answer (Doc. # 6). Chuck Shaner filed a motion seeking dismissal of the complaint or a more definite statement of the claims against him, which was granted. Thereafter, in June of 2003, Sanders filed the First Amended Complaint which both the City of Montgomery and Chuck Shaner answered. Chuck Shaner moved for summary judgment on all claims against him in August of 2003. On September 4, 2003, Sanders responded by indicating that he did not oppose letting Chuck Shaner out of the case and by seeking to leave to file a Second Amended Complaint, which dropped all claims against Chuck Shaner. Neither defendant opposed this motion for leave to amend.

While his September 2003 motion for leave to file the Second Amended Complaint was pending, Sanders again sought leave to amend his complaint on December 10, 2003, less than a week before this case was scheduled for a final pretrial conference on December 16, 2003.[1] By this proposed amendment in December of 2003, Sanders attempted to broaden the scope of the claims brought in this lawsuit to include additional claims pursuant to 42 U.S.C. § 1983 and new claims pursuant to Title VII and Section 1981, including claims based on different theories of liability, such as a disparate impact claim, and

---

1. The scheduled December 2003 pretrial and the January 2004 trial were eventually cancelled due a death in the family of Sanders' counsel on the eve of the December 2003 pretrial.

claims based on different factual predicate than that previously plead. The City of Montgomery objected to the December 2003 attempt to amend the complaint as untimely.

On March 1, 2004, this Court granted Sanders leave to file the Second Amended Complaint (Doc. # 81) and denied Chuck Shaner's motion for summary judgment as moot (Doc. # 82). On March 1, 2004 (Doc. # 81), the Court also rejected Sanders' December 2003 attempt to expand the scope of this litigation beyond the claims plead in the Second Amended Complaint due to Sanders' failure to show good cause for being granted leave for the untimely amendment. *See, e.g., Sosa v. Airprint Sys., Inc.,* 133 F.3d 1417, 1419 (11th Cir. 1998) (applying the Rule 16 "good cause" standard rather than the more liberal standard of Rule 15 to attempt to amend pleading after deadline set by Court's scheduling order is appropriate). The Court ruled that Sanders could only pursue the claims for which a factual and legal predicate was set forth in the Second Amended Complaint proposed in September of 2003. On March 3, 2004, Sanders filed the Second Amended Complaint (Doc. # 83) as he had been granted leave to do. Thus, the only remaining defendant is the City of Montgomery.

■■■ Despite this Court's ruling on Sanders' earlier attempts to enlarge the scope of this litigation, Sanders again submitted contentions beyond the factual and legal scope of the Second Amended Complaint when the parties submitted a proposed pretrial order in advance of the March 25, 2004 pretrial hearing in this case. Again, the City of Montgomery objected to the expansion of the scope of the litigation. At the pretrial, the Court explained that Sanders would not be allowed to inject new claims into the litigation and directed the parties to submit a new and proper proposed pretrial order. A plaintiff cannot circumvent the consequences of failure to timely amend the complaint by adding new claims or factual bases for a case through the submission of a proposed pretrial order containing them. This is especially true where, as here, the defendant objects to the new claims or contentions. On April 13, 2004, this Court entered the Order on Pretrial Hearing.

The factual predicate alleged in the Second Amended Complaint (Doc. # 83) is as follows. Some of the facts alleged are clearly outside the statute of limitations period and must be alleged as background information. The City of Montgomery hired Sanders in November of 1994, as a laborer. According to Sanders' allegations, all employees are hired into the "laborer" position to avoid "hiring by merit." The City of Montgomery promoted Sanders to Heavy Equipment Operator II, but Sanders contends that he did not receive this promotion until after all other Caucasian male employees hired at the same time he was hired had been promoted. Sanders alleges that the City of Montgomery denied him training that would allow him to advance, but allowed a less experienced Caucasian employee, Johnnie Shaner[2] to receive landfill management training and certify for mechanical training on the job. Sanders asked for training again in December of 2002, but he was told that there wasn't going to be any more training for awhile. Shortly thereafter, Sanders alleges that another employee was given training. The race of this employee is not specified in the Second Amended Complaint, but he is described as "an employee who agreed to withdraw his complaint against the City." Sanders alleges that the City of Montgomery altered promotion policies and qualifications to favor Cauca-

---

2. Johnnie Shaner is Chuck Shaner's nephew.

sian employees and refused to allow other employees to share information with him.

In the Spring of 2001, the City of Montgomery promoted three men to Construction Operator II after Chuck Shaner had arranged for them to get a Class B Commercial Driver's License. Sanders obtained a Class A Commercial Driver's License, which he contends is "superior." When Chuck Shaner found out that Sanders had done this, he accused Sanders of trickery and opening up the City of Montgomery to a lawsuit. Two of the three men promoted instead of Sanders were Caucasian. One of the three was African-American, but according to Sanders, he had previously sued the City of Montgomery. Sanders alleges that despite the City of Montgomery's decision not to promote him, he was given the same job duties and responsibilities of those who were promoted and told to correct their work. Sanders also contends that he was "forced" to work weekends because the promoted men refused to do so.

Finally, Sanders alleges that he was treated differently than Caucasian employees after landfill accidents. Sanders contends that he was ordered to take a drug screen and that the City of Montgomery prepared a safety report after two workplace accidents in which Sanders was involved. The first accident was in January of 2002 and the second was in May of 2003. Sanders alleges that Caucasian employees involved in similar mishaps were not reported or investigated. Sanders further contends that after he filed his Charge of Discrimination with the EEOC and cooperated in a theft and corruption investigation at the landfill, the City of Montgomery targeted him and falsely charged him. Sanders alleges that he was "ordered terminated."

The Second Amended Complaint sets forth several claims. Count One is brought pursuant to Title VII. It includes allegations that Sanders was discriminated against on the basis of his race when the City of Montgomery failed to promote him to Construction Operator II. Plaintiff also alleges that he was discriminated against because he had to perform the same duties as the men promoted and work shifts they refused to work, but not compensated at the same rate as the men promoted. Count Two is brought pursuant to Section 1981. It raises the same allegations as raised in Count One, but adds a claim that Sanders was treated in a manner that was derogatory and demeaning. Count Three is a negligence claim pursuant to Alabama law. Count Four alleges that from May through June of 2003, the City of Montgomery retaliated against Sanders for complaining about illegal discrimination by falsely accusing him of misdeeds and ordering the termination of his employment.

## IV. SUMMARY JUDGMENT STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323, 106 S.Ct. 2548. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the non-mov-

ing party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322–23, 106 S.Ct. 2548.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. 2548. To avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). On the other hand, a court ruling on a motion for summary judgment must believe the evidence of the non-movant and must draw all justifiable inferences from the evidence in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c).

## V. FACTS

The Court has carefully considered all deposition excerpts and documents submitted in support of and in opposition to the motion. The submissions of the parties, viewed in the light most favorable to the non-moving party, establish the following facts:

### A. The Parties

#### 1. Plaintiff

Sanders is an African–American male. He attended one year of business college in Michigan. He did not receive a certificate of completion or diploma because he did not complete his training. Sanders also received training while in the military including training on gas-turbine engines, leadership management courses, and corrosion schools. Since high school, Sanders has worked a variety of jobs. The City of Montgomery employed Sanders from November of 1994 until July of 2003. During his employment with the City of Montgomery, Sanders worked at the City of Montgomery landfill and learned how to operate heavy equipment. Although he was initially hired as a Laborer, he was eventually promoted to Heavy Equipment Operator II. Sometime between 1995 and 2000, Sanders regularly volunteered to work weekends, when other employees refused to do so. The weekend work benefited Sanders, and he viewed it as a way to get into Chuck Shaner's good graces.

#### 2. Defendant

The City of Montgomery is a governmental municipality. The City of Montgomery has a Landfill Division. The head of the Landfill Division is the Chief Administrator of Technical Services, James H. Sigler (hereinafter "Sigler"), a Caucasian male. During much of the time Sanders was employed in the Landfill Division, Chuck Shaner, a Caucasian male, held the position of Solid Waste Superintendent.[3] As such, Chuck Shaner reported directly to Sigler and supervised all employees of the Landfill Division. During the time Chuck Shaner was Solid Waste Superintendent, Noah Johnson held the position of

---

**3.** On May 17, 2002, Chuck Shaner submitted a written notice of his intent to retire for medical reasons effective May 24, 2002.

Thereafter, he did retire from his position as Solid Waste Superintendent as planned.

Assistant Solid Waste Superintendent. Noah Johnson is African–American, and he is Sanders' brother.

As of May of 2000, the Landfill Division organizational chart showed the following classified positions from highest ranking to lowest, under the supervision of Sigler, Chuck Shaner, and Noah Johnson: Construction Equipment Operator II (4 positions filled)[4]; Heavy Equipment Operator II (8 positions); Heavy Equipment Operator I (1 position); Auto Mechanic Diesel Engines (2 positions); Master Auto Mechanic (1 position); Clerk IV (two positions); Clerk III (1 position); and Clerk II (1 position). At the time this organizational chart was prepared, Sanders held the position of Heavy Equipment Operator II. The only positions on the organizational chart higher than that held by Sanders in May of 2000 were: Construction Equipment Operator II, Assistant Solid Waste Superintendent, Solid Waste Superintendent, and Chief Administrator Technical Services. At this same time, two of the four people who held the Construction Equipment Operator II positions were African–American: George Lockett (hereinafter "Lockett") and Dale Zeigler (hereinafter "Zeigler"). At this time, a Caucasian employee held the position of Construction Equipment Operator II; that employee was Johnnie Shaner, Chuck Shaner's nephew. The remaining Construction Operator II in May of 2002 was Kelly Johnson. There are hints in the record that Kelly Johnson may be the brother of Noah Johnson and Sanders, but the record does not clearly disclose his race.

## B. Sanders' Employment with the City of Montgomery Prior to the 2001 Promotions

On May 4, 2000, Sanders completed an application for promotion to Construction Equipment Operator II. Although the evidence before the Court does not place an exact date on the conversation, at some point prior to the promotions in February of 2001, Chuck Shaner told Sanders that he was going to promote Sanders to Construction Equipment Operator II and said that the only men who could do the job were Zeigler, Kelly Johnson, and Sanders.[5] Both Chuck Shaner and Assistant Superintendent Noah Johnson stated that Sanders was the best man for the promotion. Chuck Shaner said that David Cain, whose name was listed as a candidate was not going to be promoted because he was "gone." According to Sanders' testimony, Chuck Shaner also made statements that led Sanders to believe that Chuck Shaner he had decided to recommend the promotion of two other applicants, Michael Lane (hereinafter "Lane")[6] and William D. "Bo" Henderson (hereinafter "Henderson"), in addition to the promotion of Sanders, because in Chuck Shaner's opinion Lane and Henderson were both lawsuits waiting to happen. Although Sanders testified that Chuck Shaner was also concerned that another applicant, David L. Hatcher (hereinafter "Hatcher") might file a lawsuit if he was not selected for promotion, Sanders maintained that he believed that Chuck Shaner was going to recommend that Sanders be given the promotion.

---

4. Although not shown on the organizational chart, another Construction Equipment Operator II position had been vacated sometime prior to April 18, 2000, when W.S. Jackson retired.

5. Prior to May of 2000, the City of Montgomery had already promoted Zeigler and Kelly Johnson to the position of Construction Equipment Operator II.

6. According to the record, Lane was formerly known as Michael Hood.

## C. The Promotion Decisions Challenged

Pursuant to Alabama law, the Montgomery City–County Personnel Board (hereinafter "the Personnel Board") is the body charged with recruiting and qualifying applicants for employment with the City of Montgomery. The Personnel Board rules and regulations provide that when there are five or fewer applicants who meet the minimum qualifications for an announced promotional examination, the departmental register, which is the list of candidates eligible to be considered for promotion, must include all of the minimally qualified applicants.

In April of 2000, Sigler requested that the Executive Assistant to the Mayor of the City of Montgomery provide a departmental register so that the Landfill could fill the vacancy created when W.S. Jackson retired from his position as a Construction Equipment Operator II. On January 26, 2001, Sigler requested that the Executive Assistant to the Mayor of the City of Montgomery provide a departmental register so that the Landfill could fill two vacancies in the Construction Equipment Operator II positions. One position was made available on December 22, 2000, when the City of Montgomery dismissed Kelly Johnson. The other position became available when Johnnie Shaner was promoted on January 19, 2001 to fill a vacant Automotive Mechanic position created when Jesse Boyd retired. Two of these three Construction Equipment Operator II positions were filled on February 28, 2001, and the other was not filled until April 18, 2001.

Using a job description revised in July of 1998, the City of Montgomery advertised the openings.[7] During the period from May 1, 2000 to May 4, 2000, the City of Montgomery received five applications for the Construction Equipment Operator II positions. The five applicants were: Sanders; David Cain (hereinafter "Cain"); Hatcher; Henderson; and Lane. Sanders and Lane are African–American. Henderson, Hatcher, and Cain are Caucasian. Working with input from Chuck Shaner[8] and information from the applications submitted by the applicants, the City of Montgomery determined that all five of the applicants were minimally qualified for the position and put them on the departmental register. This means that any of the five could have been promoted to the position. Chuck Shaner interviewed the five candidates for the position questioning each of them about their knowledge of the landfill.

On February 28, 2001, the City of Montgomery selected Lane and Henderson for promotion to Construction Equipment Operator II. On April 13, 2001, the City of Montgomery selected Hatcher for promotion to Construction Equipment Operator II. With respect to each of these promotion decisions, the supporting City of Montgomery paperwork is approved by: Sigler, the Department Head; the Finance Director, whose signature makes his name indecipherable; Barbara Montoya, the Personnel Director; and Bobby Bright, the Mayor of the City of Montgomery. Sanders contends that Chuck Shaner made the decision regarding who would be rec-

---

7. Sanders suspects that Chuck Shaner was responsible for the July 1997 changes to the job description, but he offers no sworn testimony based on personal knowledge supporting this suspicion. Chuck Shaner has submitted sworn testimony that he had no authority to change the qualifications for the position.

8. Sander's application did not list any supervisory experience. Supervisory experience was a critical factor considered by the Personnel Board analyst who certified the employees as qualified and eligible for promotion. Chuck Shaner advised the Personnel Board that Sanders and the other candidates did have supervisory experience.

ommended for these promotions. Certainly, Chuck Shaner's statements to Sanders create a reasonable inference that he would be the one recommending that certain individuals be promoted. Moreover, there is little evidence that Sigler had enough direct contact with the Landfill employees to form conclusions about who should be promoted absent input from Chuck Shaner. Viewing the evidence in the light most favorable to Sanders, the Court finds that a reasonable jury could find that Chuck Shaner either influenced or dictated the recommendations Sigler made concerning who should be promoted to Construction Equipment Operator II in the Spring of 2001.

The selection of Lane, Henderson, and Hatcher meant that two Caucasian men and one African–American man were promoted. It also meant that two men, one Caucasian and one African–American, were not selected for promotion. Sanders is the African–American candidate who was not selected for promotion.

For each of the three promotions, a Position Fill Request sheet was contemporaneously completed. This sheet listed the names of all five applicants for the Construction Equipment Operator II positions and gave a reason for the recommendation that the promoted individual be selected for promotion. The Position Fill Request sheet for the promotion of Lane sets forth the following rationale for his selection for promotion:

Michael L. Lane—He graduated from John Patterson Technical College second in his class for Heavy Equipment. He follows instructions and does not require supervision to complete a job. He also has seniority over the other candidates.

The Position Fill Request sheet for the promotion of Henderson sets forth the following rationale for his selection for promotion:

William D. Henderson—Mr. Henderson has attended trade school for the operation of heavy equipment. He has the skills required to complete a task without repeated directions. He is punctual and reliable.

The Position Fill Request sheet for the promotion of Hatcher sets forth the following rationale for his selection for promotion:

David L. Hatcher—Mr. Hatcher has been with the Landfill since 2/8/1991. He is the senior qualifying applicant. He is reliable and works well under minimum supervision. He is versatile in the operation of landfill equipment. He is also trained in welding. He has good daily practices and is the best qualified candidate for the Construction Equipment Operator II position.

Sanders contends that Chuck Shaner developed these written rationales for the promotion decisions, but there is no evidence before this Court supporting this contention. Chuck Shaner does not deny that he had input into the selection of the candidates to be promoted, but he does deny that race played any part in the decision-making process for these promotions.

### D. Post–Promotion Events

#### 1. Chuck Shaner Attempts to Promote Sanders

In May of 2001, prior to any complaint by Sanders about alleged discrimination, Chuck Shaner requested that Johnny Sanders be promoted from Heavy Equipment Operator II to Construction Operator II, but Sigler told him that there was not sufficient money in the budget to permit this promotion.

### 2. Lane and Henderson Need Help Performing in their New Positions

For approximately one year after the promotions, Zeigler was assigned to re-do and fix the work of Lane and Henderson. At this time, Zeigler was a Construction Equipment Operator II, like Lane and Henderson. Zeigler was then transferred to the excavator. Thereafter, around the Spring of 2002, Sanders was assigned to redo their work covering the trash, leveling out the field, and making slopes so water would run off. Sanders was not paid additional money for these assignments. While Sanders contends that he was humiliated by having to correct the work of men promoted instead of him, there is no evidence that Sanders was asked to do anything that was not in his job description, nor is there any evidence that the City of Montgomery intended for Sanders to feel humiliated by this assignment.

### 3. Changes After Chuck Shaner's May 2002 Retirement

After Chuck Shaner's retirement, it appears that Noah Johnson, Sanders' brother, became Acting Solid Waste Superintendent. Sanders believes that at that time George Lockett became Assistant Solid Waste Superintendent. Both Noah Johnson and George Lockett are African–American. After Chuck Shaner retired, Sanders asked Sigler if he could receive some training. Sigler told Sanders there wouldn't be any training for awhile because there was no money for it. Sanders believes that after this conversation with Sigler, George Lockett twice went to training schools. It is undisputed that the denial of Sanders' request for training at this juncture had no effect on his ability to be promoted.

### E. Sanders' Charge of Discrimination

On April 24, 2002, Sanders filed a Charge of Discrimination with the Equal Employment Opportunity Commission.[9] This Charge of Discrimination alleged race discrimination and retaliation by the City of Montgomery. Sanders' Charge of Discrimination indicated that the conduct of which he complained was of a continuing nature. Specifically, Sanders complained that he was denied training which would have allowed him to advance while allowing a Caucasian employee with less experience to receive training. Sanders complained that he was denied a promotion in November 2000. He claimed that he was also later denied promotion in favor of Henderson, Hatchett, and Lane. Sanders complained in a general fashion about hiring practices at the landfill being racially discriminatory. He complained that after being in an accident in March of 2002 in which a City of Montgomery vehicle was damaged, he was made to take a urinalysis test and a safety report was made, but that when Johnny Shaner was involved in an incident which damaged a truck body it was not reported and no action was taken against Johnny Shaner. Sanders complained that another Caucasian employee, Albert Haney, had been involved in an accident with an earthmover and no report was made and no action was taken against him. On September 5, 2003, the EEOC mailed Sanders a Dismissal and Notice of Rights letter notifying him that it was closing the file on his Charge of Discrimination and advising him that his lawsuit must be filed within ninety days of his receipt of the letter.

---

**9.** It appears from the Charge of Discrimination that it was prepared with the assistance of Sanders' counsel.

### F. Post–Charge Events Sanders Contends Constituted Retaliation

#### 1. Sanders' Claims Regarding the Response to Workplace Accidents

In support of his retaliation claim, Sanders relies on the way that the City of Montgomery reacted when he was involved in two separate workplace accidents. The first accident took place in January of 2002 and involved damage to a City of Montgomery vehicle Sanders was operating. After reporting the accident, Sanders was subjected to a drug test. A formal report of the incident was prepared documenting the damage to the vehicle. Sanders complains that similar accidents involving other employees were handled differently that this accident.[10]

The second accident took place on May 27, 2003. Sanders was burned on the heel of his hand when he attempted to check the over-heated idle rotor on a parked bulldozer and hot oil sprayed him. Sanders sought salve from the Landfill office and while there, he inquired about which emergency room was open that day. A clerk in the Landfill office encouraged him to go to see a doctor and arranged for an appointment that afternoon. Sanders left as if he was going to go to the appointment with the doctor, but then called the Landfill office to say he had decided that he was not going to keep the appointment with the doctor.

Based on this information, the City of Montgomery decided that Sanders' decision not to seek medical treatment in those circumstances constituted grounds for a reasonable suspicion for drug testing pursuant to the Drug and Alcohol Abuse Policy for the City of Montgomery. That policy provides that when the employer has reasonable suspicion to believe that an employee is using or possessing illegal drugs or is under the influence of alcohol while working for the City of Montgomery, the employee must be administered a drug screen. According to the policy, "abnormal or erratic behavior of the employee" is one of many grounds for reasonable suspicion to believe the employee may be using or possessing illegal drugs or is under the influence of alcohol at work. The policy further provides that a drug screen must be performed after each and every on the job injury that is treated by a physician. Drug tests after workplace injuries must be completed within twelve hours. Pursuant to the policy, an employee's refusal to submit to a request for a drug or alcohol screen pursuant to the policy is grounds for termination. Moreover, an employee who is requested to submit to a drug or alcohol screen must report to the testing facility designated by the City of Montgomery.

On the morning of May 28, 2003, the City of Montgomery ordered Sanders to submit to a drug test by providing a hair sample by 4 p.m. or face termination. Sanders contacted his attorney. Sanders' attorney demanded a copy of the drug testing policy [11] and filed a motion for a temporary restraining order. At 3:55 p.m. on May 28, 2003, Jeffrey Downes (hereinafter "Downes"), the City of Montgomery employee charged with administration of the drug tests learned that Sanders was

---

**10.** Because the January 2002 accident predated any of Sanders' protected conduct, the Court cannot see how it could constitute evidence of retaliation against him for protected conduct.

**11.** It is undisputed that the City of Montgomery had provided Sanders with a copy of this policy in 2002, long before the May workplace injury and that Sanders had previously submitted to a test under the policy after being involved in an incident while operating a City of Montgomery vehicle, which caused damage to that vehicle.

having car trouble. Downes learned this from someone at the Landfill. Downes informed that person Sanders was to report to Downes' office first thing in the morning on May 29, 2003 for a drug test. Sanders did not appear at Downes' office on May 29, 2003. Instead, on May 29, 2003, Sanders paid for his own drug test at a laboratory he deemed reputable. Unlike the drug test the City of Montgomery wished to conduct, this test was performed on a urine sample Sanders provided to the lab, rather than on a hair sample. The results of the test Sanders' had performed were negative for illegal drugs.

Based on Sanders' failure to report for testing Downes recommended that Sanders' employment be terminated. He conveyed this recommendation by memorandum to Sigler dated May 29, 2003. Downes' undisputed testimony is that all employees of the City of Montgomery who have failed to submit to drug testing pursuant to the City of Montgomery's policy have either resigned or had their employment with the City of Montgomery terminated.

On June 3, 2003, this Court held a hearing on Sanders' request for a preliminary injunction. Several witnesses testified at this hearing. Sanders argued that the City of Montgomery's demand that he take a drug test by providing a hair sample was intended to harass him for filing his suit against the City of Montgomery and noted that his deposition had been taken on May 16, 2003. There is no evidence before this Court that anyone from the City of Montgomery ever told Sanders that the request for the drug test was connected in any way to his April 2002 Charge of Discrimination or his December 2002 lawsuit. Sanders' argument that the drug test request was retaliatory was based on circumstantial evidence: most notably the timing of the request and Sanders' contention that other employees involved in workplace accidents were not required to submit to drug tests. The Court held that Sanders had failed to prove the requisite elements in support of the preliminary injunction sought and denied Sanders' motion.

### 2. Sanders' Claims He Was Singled Out with Theft Accusations

In further support of his retaliation claim, Sanders argues that he was falsely accused of stealing antifreeze from the landfill. Sanders had salvaged some waste antifreeze from a five-gallon plastic bucket and later replaced the antifreeze he had used by buying new antifreeze. In support of this contention, Sanders points to a memorandum dated May 29, 2003, which contained an accusation by Albert Haney that Sanders had taken antifreeze from the Landfill for his personal vehicle. Apparently this alleged improper taking of antifreeze occurred on May 6, 2003 and Johnnie Shaner reported it to Bill Manasco on May 8, 2003. No evidence is presented to explain why an additional memorandum describing the incident was prepared on May 29, 2003.

### 3. Sanders' Resignation

By a notice dated June 4, 2003, the City of Montgomery informed Sanders that it was being recommended that he be dismissed from his employment with the City of Montgomery for failure to submit to a drug screen as requested per the City of Montgomery Drug and Alcohol Abuse Policy and for theft of City property. This notice indicates that a hearing will be set for the Appointing Authority to consider the recommendation and the charges. Sanders prepared a statement in his defense which he argues he presented at a disciplinary hearing.[12]

---

12. While Sanders submitted a copy of this statement, the Court has not been able to locate any evidence before it regarding if or when it was presented at a disciplinary hearing. Sanders' brief contains this assertion,

On July 7, 2003, Sanders submitted a sworn memorandum announcing his intention to resign his employment with the City of Montgomery to Mayor Bobby Bright, Jim Sigler, and Barbara Montoya. Sanders explained that he had been an employee of the City of Montgomery landfill for eight years, but that he could not continue to work for the City of Montgomery "under the current policies of harassment and intimidation and bias." In the memorandum, Sanders complained about having been accused of stealing discarded waste antifreeze from the landfill when no action was taken against other employees who had stolen items from the landfill. He complained when he was burned on a defective piece of equipment he was ordered to take a drug test after refusing to go to the doctor. He complained that it was recommended that he be fired for refusing to take that drug test even though he took one on his own and despite the fact that no supervisor had made a complaint against him. Sanders concluded that it was clear that the City of Montgomery only wanted to harass him and retaliate against him because he had filed a race discrimination lawsuit against it and Chuck Shaner. After asserting that Chuck Shaner continued to run the landfill through his nephew Johnnie Shaner, Sanders stated that the City of Montgomery continued to allow racial discrimination and to reward those who practice it and that he could no longer work in such an environment.

It is undisputed that Sanders did not avail himself of the administrative procedures available to him to appeal an unfavorable employment decisions. Instead, he submitted a letter of resignation. Consequently, the City of Montgomery's records reflect that Sanders resigned from his position.

## VI. DISCUSSION

### A. Claims Arising Out of the Spring 2001 Promotions

#### 1. Title VII Claims

■ The City of Montgomery argues that Sanders' claims pursuant to Title VII for alleged race discrimination in promotion decisions are barred because Sanders failed to file a timely charge of discrimination with the EEOC.[13] The Court agrees. Title 42 U.S.C. § 2000e-(5)(e)(1) specifies the prerequisites that a plaintiff must satisfy before filing a private civil action under Title VII. *See National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 S.Ct. 2061, 2070, 153 L.Ed.2d 106 (2002). According to this provision, "[a] charge … shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred[.]" 42 U.S.C. § 2000e-(5)(e)(1). *Accord, Pijnenburg v. West Ga. Health Sys., Inc.*, 255 F.3d 1304, 1305 (11th Cir.), *reh'g denied*, 273 F.3d 1117 (11th Cir.2001) ("It is settled law that in order to obtain judicial consideration of a [Title VII] claim, a

---

but it is not supported by any of the evidence identified in support of the assertion. The brief submitted by the City of Montgomery includes an assertion that Sanders submitted a letter of resignation before a disciplinary hearing could be held. Again, this assertion is not supported by any of the evidence identified in support of the assertion. Due to the state of the evidentiary record before it, the Court cannot ascertain whether Sanders participated in a disciplinary hearing on the

charges against him before submitting his letter of resignation.

**13.** Sanders alleges, and the City of Montgomery does not dispute, that Sanders filed this lawsuit within ninety days of his receipt of the EEOC's Dismissal and Notice of Rights letter relating to his Charge of Discrimination. The City of Montgomery does not concede, however, that Sanders has satisfied all of the procedural prerequisites to bringing his claims pursuant to Title VII.

plaintiff must first file an administrative charge with the EEOC within 180 days after the alleged unlawful employment practice occurred."). This requirement guarantees "the protection of civil rights laws to those who promptly assert their rights" and "also protects employers from the burden of defending claims arising from employment decisions that are long past." *Delaware State Coll. v. Ricks,* 449 U.S. 250, 256–57, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980).

The United States Supreme Court has explained that "strict adherence" to this procedural requirement "is the best guarantee of evenhanded administration of the law." *Mohasco Corp. v. Silver,* 447 U.S. 807, 826, 100 S.Ct. 2486, 65 L.Ed.2d 532 (1980). By choosing this relatively short deadline, "Congress clearly intended to encourage the prompt processing of all charges of employment discrimination." *Id.* Indeed, this procedural rule, is not a mere technicality, but an integral part of Congress' statutory scheme that should not "be disregarded by courts out of a vague sympathy for particular litigants." *Baldwin County Welcome Ctr. v. Brown,* 466 U.S. 147, 152, 104 S.Ct. 1723, 80 L.Ed.2d 196 (1984). Thus, if a plaintiff fails to file an EEOC charge before the 180–day limitations period, the plaintiff's subsequent lawsuit is barred and must be dismissed for failure to exhaust administrative remedies. *See, e.g., Brewer v. Alabama,* 111 F.Supp.2d 1197, 1204 (M.D.Ala. 2000).

Of course, the determination of whether a plaintiff has filed a timely EEOC charge depends on when the alleged unlawful employment practice "occurred." The United States Supreme Court recently provided further clarification of the nature of this inquiry and set forth different standards for claims involving "discrete acts" and "hostile environment" allegations. *See*

*generally, Morgan,* 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106.

■ In cases involving discrete discriminatory acts, such as termination of employment, *failure to promote,* denial of transfer, or refusal to hire, a discrete discriminatory act occurs on the day that it happens. *Morgan,* 122 S.Ct. at 2070, 2073. "Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'" *Id.* at 2073. Consequently, "discrete discriminatory acts are not actionable if time barred, *even when they are related to acts alleged in timely filed charges.*" *Id.* at 2072 (emphasis added). Each such act starts a new clock for filing charges. *Id.* Moreover, the limitations period begins to run when an employee received notice of the allegedly discriminatory act, not when the consequences of the decision become painful to the employee. *See, e.g., Ricks,* 449 U.S. at 257, 101 S.Ct. 498; *Brewer,* 111 F.Supp.2d at 1205.

Consequently, Sanders can only litigate his claims arising out of an allegedly discriminatory failure to promote him if he made a proper complaint to the EEOC within 180 days of the promotional decision he seeks to challenge. *See, e.g., Morgan,* 122 S.Ct. at 2070, 2073. In the present case, Sanders filed his EEOC charge on April 24, 2002. Therefore, the Charge is timely only if the discrete unlawful employment actions of which he complains "occurred" on or after October 26, 2001. *See, Morgan,* 122 S.Ct. at 2070 (holding that a party must file an EEOC charge within 180 days from the date the unlawful act occurred or lose the ability to recover for it). The promotion decisions he challenges are paradigmatic discrete acts, which occurred on February 28, 2001 and April 13, 2001. The Court is not persuaded by Sanders' contention that the denial of the promotion was converted from a

discrete act into a hostile environment claim when approximately a year after the promotion decisions, Sanders was asked to perform corrective work on tasks assigned to the men who had been promoted. Simply put, Sanders challenge to the failure to promote him is a challenge to discrete acts which was not timely brought to the EEOC and the facts presented by this case simply do not establish an actionable hostile environment claim.

Sanders failed to file a Charge of Discrimination with the EEOC within 180 days of either February 28, 2001 or April 13, 2001. Indeed, to the extent that the Defendant City of Montgomery's Motion for Summary Judgment (Doc. # 45) seeks summary judgment on all of Sanders' claims *pursuant to Title VII* it is due to be GRANTED with respect to all claims relating to discrete actions of discrimination, including all promotional decisions, made prior to October 2, 2001. This includes Sanders' claim that he was discriminated against on the basis of his race in February and April of 2001 when the City of Montgomery promoted Lane, Henderson, and Hatcher.

### 2. Section 1981 Claims

■ Unlike their counterparts brought pursuant to Title VII, claims of race discrimination pursuant to Section 1981 do not require timely exhaustion of administrative remedies with the EEOC prior to suit. Although a plaintiff wishing to pursue a claim of race discrimination pursuant to Section 1981 need not timely file a Charge of Discrimination with the EEOC, such a plaintiff must file his lawsuit asserting such claims within two years

of the events giving rise to the suit because Section 1981 claims are subject to a two-year statute of limitations. *See, e.g., Shows v. Morgan*, 40 F.Supp.2d 1345, 1362 (M.D.Ala.1999). Because this suit was filed December 3, 2002, any claims predicated on events that occurred before December 3, 2000 are time-barred. Given that some of Sanders' complaints arise out of events prior to December 3, 2000, those claims may not be litigated in this action.

■ Sanders claims that he was denied promotion to Construction Equipment Operator II in February and April of 2001 are not barred by the applicable two-year statute of limitations for Section 1981 claims. Thus, Sander may proceed with these claims pursuant to Section 1981 even though the claims cannot be brought pursuant to Title VII. The legal analysis of claims of race discrimination pursuant to either Section 1981 and Title VII is the same. *See, e.g., Patterson v. McLean Credit Union*, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989); *Howard v. BP Oil*, 32 F.3d 520, 524 n. 2 (11th Cir.1994).

An employee bringing a discrimination claim must initially establish a *prima facie* case of discrimination through one of three methods: by presenting direct evidence of discriminatory intent, presenting circumstantial evidence of discrimination by satisfying the analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and its progeny, or by introducing statistical evidence of discrimination. *Walker v. NationsBank of Florida, N.A.*, 53 F.3d 1548, 1556 (11th Cir.1995). Because Sanders has presented neither appropriate statistical evidence, nor direct evidence,[14] in sup-

---

**14.** Sanders makes an extensive argument that he has presented direct evidence in support of his claims of discrimination. The Eleventh Circuit Court of Appeals has made it plain that

[d]irect evidence is "evidence, which if believed, proves [the] existence of [the] fact in

issue without inference or presumption." *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1189 (11th Cir.1997) (quoting *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1528 n. 6 (11th Cir.1987)). If the plaintiff offers direct evidence and the trier of fact accepts that evidence, then the plaintiff has proven

port of his claims of discrimination, the Court will only address Sanders' claims through the analysis applicable to cases based on circumstantial evidence.

To establish a discrimination claim by circumstantial evidence using the *McDonnell Douglas* framework, the employee has the initial burden of showing, by a preponderance of the evidence, a *prima facie* case of the proscribed practice. *Young v. General Foods Corp.*, 840 F.2d 825, 828 (11th Cir.1988), *cert. denied*, 488 U.S. 1004, 109 S.Ct. 782, 102 L.Ed.2d 774 (1989). The essence of the *prima facie* case is that the employee presents circumstantial evidence sufficient to generate a reasonable inference by the fact finder that the employer used prohibited criteria in making an adverse decision about the employee. If established, the *prima facie* case raises a rebuttable presumption that the employer is liable to the employee. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). "Demonstrating a *prima facie* case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir.1997).

The Eleventh Circuit Court of Appeals has repeatedly emphasized that the requisite showings that make up a *prima facie* case are not meant to be rigid or inflexible. *See, e.g., Schoenfeld v. Babbitt*, 168 F.3d 1257, 1268 (11th Cir.1999) (collecting cases).

In cases where the evidence does not fit neatly into the classic prima facie case formula, for example, [the Eleventh Circuit has] stated that "[a] prima facie

case of disparate treatment can be established by any 'proof of actions taken by the employer from which we infer discriminatory animus because experience has proved that in the absence of any other explanation it is more likely than not that those actions were bottomed on impermissible considerations.'"

*Id.* at 1268 (citing *Hill v. Metro. Atlanta Rapid Trans. Auth.*, 841 F.2d 1533 (11th Cir.1988), *modified*, 848 F.2d 1522 (11th Cir.1988) (quoting *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 576, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978))).

Once a plaintiff establishes the requisite elements of the *prima facie* case, the defendant has the burden of producing a legitimate, non-discriminatory reason for the challenged employment action. *See, e.g., Holifield v. Reno*, 115 F.3d at 1564 (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). The employer's burden is "exceedingly light." *Holifield*, 115 F.3d at 1564. This burden is one of production, not persuasion and consequently, the employer need only produce evidence that could allow a rational fact-finder to conclude that the challenged employment action was not made for a discriminatory reason. *See, e.g., Davis v. Qualico Miscellaneous, Inc.*, 161 F.Supp.2d 1314, 1321 (M.D.Ala.2001).

If such a reason is produced, a plaintiff then has the ultimate burden of proving the reason to be a pretext for unlawful discrimination. *See, e.g., Holifield*, 115 F.3d at 1565; *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir.1997)

discrimination. *McCarthney v. Griffin–Spalding County Bd. of Educ.*, 791 F.2d 1549, 1553 (11th Cir.1986).
*Maynard v. Board of Regents of Div. of Universities of Fla. Dep't of Educ. ex rel. Univ. of S. Fla.*, 342 F.3d 1281, 1289 (11th Cir.2003). Having reviewed the evidentiary record as a

whole, the Court finds no evidence which if believed proves the existence of discrimination without inference or presumption. Having failed to offer direct evidence Sanders must rely on the circumstantial evidence model of proof. *Id.*

(plaintiff "has the opportunity to discredit the defendant's proffered reasons for its decision"). Thus, once the employer articulates a legitimate, non-discriminatory reason, the burden returns to the employee to supply "evidence, including the previously produced evidence establishing the *prima facie* case, sufficient to permit a reasonable fact-finder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Davis,* 161 F.Supp.2d at 1322 (citing *Chapman v. AI Transp.,* 229 F.3d 1012, 1024 (11th Cir.2000) (*en banc* )). The plaintiff may seek to demonstrate that the proffered reason was not the true reason for the employment decision "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine,* 450 U.S. at 256, 101 S.Ct. 1089; *Combs,* 106 F.3d at 1528. A plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 148, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

▮▮ Sanders' first specific claim of discrimination is that he was denied promotion to Construction Equipment Operator II on account of his race. Section 1981 provides a remedy to those who can show that they were discriminated against on the basis of their race by their employer with respect to a promotional decision. *See, e.g., Sledge v. Goodyear Dunlop Tires N. Am. Ltd.,* 275 F.3d 1014, 1018 (11th Cir.2001); *Gaddis v. Russell Corp.,* 242 F.Supp.2d 1123, 1134–35 (M.D.Ala.), *aff'd without opinion,* 88 Fed.Appx. 385 (11th Cir.2003). To establish a *prima facie* case in a failure to promote claim, the plaintiff must prove the following four elements:

1) that [he] belongs to a protected class; 2) that [he] was qualified for a job for which the employer was seeking applicants; 3) that despite [his] qualifications, [he] was rejected; and 4) that, after [his] rejection, the employer continued to seek applicants or filled the position with a person outside of plaintiff's protected class.

*Gaddis,* 242 F.Supp.2d at 1135. *Accord, Walker v. Mortham,* 158 F.3d 1177, 1186 (11th Cir.1998), *cert. denied,* 528 U.S. 809, 120 S.Ct. 39, 145 L.Ed.2d 36 (1999). With respect to the promotion of Henderson and Hatcher, the Court finds that Sanders has established a *prima facie* case. However, with respect to the promotion of Lane, the Court finds that Sanders has failed to establish a *prima facie* case of race discrimination because the position filled by Lane was not filled with a person outside of Sanders' protected class (African–American). Thus, the City of Montgomery is entitled to judgment as a matter of law on Sanders' claim that he was discriminated against on account of his race when the City of Montgomery promoted Lane instead of promoting Sanders.

With respect to the promotion of Henderson and Hatcher, the Court finds that the City of Montgomery has proffered legitimate reasons for its decision to promote Henderson and Hatcher. These reasons were set forth in writing at the time the decision to promote Henderson and Hatcher and the reasons have nothing to do with the race of the applicants. Where, as here, the employer produces a legitimate, nondiscriminatory reason for the challenged employment action, it satisfies its burden. Consequently, the City of Montgomery has eliminated the presumption of discrimination created by Sanders' establishment of a *prima facie* case and will be entitled to summary judgment on this claim unless Sanders comes forward with evidence sufficient to permit a reasonable fact finder to conclude that the rea-

sons given by the City of Montgomery were not the real reasons for the adverse employment decision. *Chapman*, 229 F.3d at 1024 & 1037.

Rather than arguing that the City of Montgomery's proffered legitimate, nondiscriminatory reasons for promoting Henderson and Hatcher were pretextual, Sanders instead contends that *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003) relieves him of the obligation to do so. In *Desert Palace*, the United States Supreme Court held that in order to obtain a mixed-motive jury instruction under Title VII, "a plaintiff need only present sufficient evidence for a reasonable jury to conclude by a preponderance of the evidence that 'race, color, religion, sec, or national origin was a motivating factor for any employment practice' " and that a plaintiff need not present "direct evidence" of discrimination in order to obtain the mixed-motive jury instruction. 123 S.Ct. at 2155.

■ Some courts have concluded that *Desert Palace* altered the summary judgment analysis of discrimination claims. *See, e.g., Dunbar v. Pepsi–Cola Gen. Bottlers of Iowa, Inc.*, 285 F.Supp.2d 1180, 1196 (N.D.Iowa 2003). Other courts have gone further and held that *Desert Palace* spells the end of the *McDonnell Douglas* burden-shifting paradigm altogether. *See, e.g., Dare v. Wal–Mart Stores, Inc.*, 267 F.Supp.2d 987, 990–991. Importantly, however, neither this Court, nor the Eleventh Circuit Court of Appeals has adopted either of these interpretations of the impact of *Desert Palace* on the analysis of summary judgment in discrimination cases. To the contrary, this Court has held

that "[t]here is nothing in *Desert Palace* to undermine the usefulness of *McDonnell Douglas." Herawi v. State of Ala. Dep't of Forensic Sciences*, 2004 WL 728408 at \*7 (M.D.Ala.2004) (Thompson, J.). This Court is not alone in reaching this conclusion. *See, e.g., Winter v. Bank of Am., N.A.*, 2003 WL 23200278 at \*3 (N.D.Tex. Dec. 12, 2003) (declining to accept contention that after *Desert Palace* the *McDonnell Douglas* paradigm no longer exists); *Gover v. Speedway Am., LLC*, 284 F.Supp.2d 858, 865 n. 1 (S.D.Ohio 2003) (same). Based on its review of these cases, the Court holds that *Desert Palace* did not alter or eliminate the *McDonnell Douglas* paradigm employed in deciding motions for summary judgment in cases based on circumstantial evidence. Thus, this Court rejects Sanders' contention that he is excused from meeting the burdens placed on him by the *McDonnell Douglas* paradigm.

■ Sanders whole opposition to the City of Montgomery's motion for summary judgment on the claims of race discrimination in the promotion of Henderson and Hatcher is limited to arguing (1) that he has proffered sufficient direct evidence to survive the motion for summary judgment and (2) that he does not have to show that there exists a jury issue as to whether the legitimate, nondiscriminatory reasons proffered for the promotion of Henderson and Hatcher are pretextual because *Desert Palace* changed the law. Sanders does present an alternative argument that even if the *McDonnell Douglas* paradigm applies, a jury question is created on whether the proffered reasons for the promotional decisions are pretextual.[15] As previously

---

**15.** There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment; the onus is on the parties to formulate arguments. *See, e.g. Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir.), *cert. denied*, 516 U.S.

817, 116 S.Ct. 74, 133 L.Ed.2d 33 (1995); *Blue Cross & Blue Shield of Ala. v. Weitz*, 913 F.2d 1544, 1550 (11th Cir.1990), *reh'g denied*, 921 F.2d 283 (11th Cir.1990); *Keel v. U.S. Dep't of Air Force*, 256 F.Supp.2d 1269, 1279 n. 27 (M.D.Ala.2003); *Cantrell v. Jay R. Smith*

explained, this Court finds that there is no direct evidence, as that term has been defined by the Eleventh Circuit Court of Appeals, which establishes without inference or presumption that the promotion of Henderson and Hatcher was the product of race discrimination. Moreover, the Court is not persuaded that *Desert Palace* excuses Sanders from satisfying burdens set forth by the *McDonnell Douglas* paradigm. Thus, because Sanders has failed to attempt to establish that the reasons proffered by the City of Montgomery for the promotion of Henderson and Hatcher were pretextual, the Court has no choice, but to grant summary judgment on this claim to the City of Montgomery, which by proffering legitimate, nondiscriminatory reasons has removed any presumption of discrimination created by Sanders' ability to establish a *prima facie* case.

**B. Other Claims of Alleged Race Discrimination Pursuant to Title VII or Section 1981**

■ Although the main focus of Sanders' claims that he was discriminated against on the basis of his race is his contention that he was discriminated against with respect to the promotional decisions made in the Spring of 2001, Sanders also makes a variety of claims that he was treated differently on account of his race with respect to pay, training, and other issues set forth in his Second Amended Complaint. At the pretrial hearing in this case, Sanders' attorney conceded his claims of disparate treatment with respect to training opportunities. Given this concession, the Court need not and will not reach this claim.[16] Sanders makes only a passing attempt to support his disparate pay claim by arguing that Chuck Shaner received "out-of-cycle" raises. The Court finds that this evidence is insufficient to establish a case of disparate treatment on the basis of race. Given the considerable difference in their positions, Chuck Shaner is not an apt comparator for Sanders. Consequently, the Court finds that the City of Montgomery is entitled to summary judgment on his other claims of race discrimination because Sanders has failed to show that he suffered adverse employment actions on account of his race. There is simply no evidence before this Court that race played a motivating role in the employment decisions Sanders challenged. Sanders conclusory allegations to the contrary are *per se* inadequate.

**C. Retaliation Claims**

■ Sanders' final federal claim is that he was retaliated against for filing a Charge of Discrimination with the EEOC in which he complained of discrimination in April of 2002, and for filing this lawsuit in December of 2002. The Court finds that Sanders has failed to establish a *prima facie* case of retaliation.

> To establish a prima facie case of retaliation, [an employee] must show: (1)[he] engaged in protected activity; (2)[his]

---

*Mfg. Co.,* 248 F.Supp.2d 1126, 1131 n. 21 (M.D.Ala.2003); *Chase v. Kawasaki Motors Corp., U.S.A.,* 140 F.Supp.2d 1280, 1286 (M.D.Ala.2001). Sanders failure to make this argument means that this Court need not address it.

**16.** Based on the evidentiary record before the Court, the Court is not persuaded that the denial of training was based on Sanders' race or that it constituted an adverse employment action in and of itself. The Court is also not persuaded that the denial of training impeded Sanders when he sought promotion to Construction Equipment Operator II. It is undisputed that he was certified to be qualified for consideration for that promotion. Moreover, although Sanders contends that Chuck Shaner arranged for the other applicants to obtain Class B endorsements on their driver's licenses, he also contends that the Class A endorsement on his driver's license, which he obtained without Chuck Shaner's assistance, was superior to that of the other applicants.

employer was aware of that activity; (3)[he] suffered adverse employment action; and (4) there was a causal link between [his] protected activity and the adverse employment action.

*Maniccia v. Brown,* 171 F.3d 1364, 1369 (11th Cir.1999) (*citing Little v. United Tech.,* 103 F.3d 956, 959 (11th Cir.1997)).

■ The City of Montgomery does not dispute that Sanders satisfied the first element of the *prima facie* case. "To establish that a plaintiff engaged in statutorily protected expression, ... a plaintiff must show that [he] 'had a good faith, reasonable belief that the employer was engaged in unlawful employment practices.'" *Weeks v. Harden Mfg. Corp.,* 291 F.3d 1307, 1311 (11th Cir.2002). Protected expression includes filing complaints with the EEOC or through an employer's internal grievance procedure. *Berman v. Orkin Exterminating Co.,* 160 F.3d 697, 702 (11th Cir.1998) (filing EEOC complaint is protected conduct); *Rollins v. Florida Dep't of Law Enforcement,* 868 F.2d 397, 400 (11th Cir. 1989) (internal complaints of discrimination are statutorily protected conduct). Thus, Sanders has shown the first element of the *prima facie* case is satisfied because he filed a Charge of Discrimination with the EEOC in April of 2002. It is further undisputed that the City of Montgomery became aware of this protected conduct in May of 2002, when it received notice of his Charge of Discrimination.

■ With respect to the third element of the *prima facie* case, the City of Montgomery argues that Sanders cannot show that he suffered an adverse employment action. The City of Montgomery argues that Sanders resigned voluntarily, and Sanders contends that he was constructively discharged. "A constructive discharge occurs when a discriminatory employer imposes working conditions that are 'so intolerable that a reasonable person in [the employee's] position would have been

compelled to resign.'" *Fitz v. Pugmire Lincoln–Mercury, Inc.,* 348 F.3d 974, 977 (11th Cir.2003) (quoting *Poole v. Country Club of Columbus, Inc.,* 129 F.3d 551, 553 (11th Cir.1997)). While the Court is not entirely convinced that the conditions Sanders faced constituted constructive discharge as a matter of law, the Court will assume for purposes of this motion that this element of the *prima facie* case is satisfied by the undisputed evidence that the City of Montgomery initiated disciplinary proceedings against Sanders by scheduling a disciplinary hearing on a recommendation that he be dismissed for theft and refusing to submit to a drug screen as directed by the City of Montgomery.

Even if this Court were to assume *arguendo* that Sanders established the adverse action element of his retaliation claim, the City of Montgomery is still entitled to summary judgment on this claim. Sanders fails to establish a *prima facie* case because he has no evidence of any causal link between any protected activity and the disciplinary action taken against him in May and June of 2003. *See, e.g., Goldsmith v. City of Atmore,* 996 F.2d 1155, 1163 (11th Cir.1993) (In order to prevail on a retaliation claim, a plaintiff must establish the requisite causal connection between her statutorily protected conduct and the adverse employment action); *Gaddis,* 242 F.Supp.2d at 1146–47 (same).

To the extent that Sanders might have intended to imply that the timing of the events constitutes some circumstantial evidence in support of the causation element, this attempt fails as a matter of law. In this case, Sanders filed a Charge of Discrimination with the EEOC more than a year before he was ordered to submit to a drug test after suffering a burn on the job and before he was told he would face a disciplinary hearing and possible dismissal. Moreover, the allegedly retaliatory con-

duct arose more than six months after Sanders filed this lawsuit against the City of Montgomery. Given the delay between the protected conduct and the allegedly retaliatory acts, the timing of the events does not constitute circumstantial evidence of causation. *See, e.g., Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 273–74, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (citing affirmatively several court of appeals decisions for the proposition that a three to four month gap is insufficient to establish the causal relation prong in a retaliation case); *Wascura v. City of South Miami,* 257 F.3d 1238, 1244–45 (11th Cir.2001) (While a close temporal proximity between two events may support a finding of a causal connection between those two events, the three and one-half month period between plaintiff's protected conduct and the adverse employment action challenged does not, standing alone, establish a causal connection); *Keel v. United States Dep't of Air Force,* 256 F.Supp.2d 1269, 1291 (M.D.Ala.2003) (more than seven month gap between protected conduct and allegedly retaliatory conduct was insufficient as a matter of law to establish the causation element of the *prima facie* case of retaliation); *Gaddis,* 242 F.Supp.2d at 1146–47 (granting employer summary judgment on three of plaintiff's retaliation claims because plaintiff was unable to establish the requisite causal connection between her protected conduct and her adverse employment actions where lapses of time six months or longer existed between the protected conduct and the adverse employment actions). Thus, the timing of events in this case presents no circumstantial evidence that the alleged adverse employment action was caused by the protected conduct. Indeed, Sanders offers no evidence from which a reasonable jury could find that the there was a causal link between his protected activity and the adverse employment action. For this reason, the City of Montgomery is entitled to summary judgment on Sanders' retaliation claim.

### D. Claims Pursuant to Alabama Law

Sanders also brings state-law claims against the City of Montgomery. This Court has jurisdiction over this claim pursuant to 28 U.S.C. § 1367. Section 1367(c)(3) provides that a "district court may decline to exercise supplemental jurisdiction over a claim if . . . the district court has dismissed all claims over which it had original jurisdiction." 28 U.S.C. § 1367(c)(3). Because the federal claims over which this Court had original jurisdiction have now been resolved against Sanders, the Court will dismiss the state-law claims, albeit without prejudice, which dismissal should not work to Sanders' disadvantage. 28 U.S.C. § 1367(d) provides for at least a 30–day tolling of any applicable statute of limitations so as to allow a plaintiff to refile his claim in state court.

## VII. CONCLUSION

For the reasons stated above, the Court will grant summary judgment against Sanders on all of his federal claims and will dismiss his state-law claims without prejudice. Accordingly, it is hereby ORDERED as follows:

1. Defendant City of Montgomery's Motion for Summary Judgment (Doc. # 45) is GRANTED to the extent it seeks entry of summary judgment on Sanders' federal claims.

2. Sanders' claims pursuant to state-law are DISMISSED WITHOUT PREJUDICE.

3. The May 17, 2004 trial setting in this case is CANCELLED.

4. Each party is hereby ORDERED to pay his or its own costs.

5. A separate final judgment pursuant to Federal Rule of Civil Procedure 58 will be entered.